# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT KLEIN ENGLER,      )
                               )
     Plaintiff,           )
                               )
v.                          )     Case No. 11-CV-7488
                               )
ROOSEVELT UNIVERSITY and      )     Judge John W. Darrah
ROOSEVELT ADJUNCT FACULTY      )
ORGANIZATION, an affiliate of the      )     Magistrate Judge Geraldine Soat Brown
Illinois Education Association and the      )
National Education Association,      )
                               )
     Defendants.          )

## AMENDED COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiff, ROBERT KLEIN ENGLER ("Plaintiff"), by his attorney of record, and for his Amended Complaint against ROOSEVELT UNIVERSITY and ROOSEVELT ADJUNCT FACULTY ORGANIZATION, an affiliate of the Illinois Education Association and the National Education Association ("Defendants") states and alleges as follows:

### I. JURISDICTION AND VENUE

1.      This Court has jurisdiction of the federal claims herein pursuant to 28 U.S.C. § 1331, and § 301 of the Labor Management Relations Act of 1947 (the "LMRA"), 29 U.S.C. § 185 *et seq.* Plaintiff brings this *hybrid* action, alleging violation of his rights under the LMRA by virtue of a breach of the collective bargaining agreement by Roosevelt University and a breach of the implied duty of fair representation by Roosevelt Adjunct Faculty Organization.

1

A decision of the Roosevelt Adjunct Faculty Organization's Executive Committee involving

these parties was entered on April 22, 2011; a copy of such decision was received by Plaintiff

and his attorney on April 25, 2011 (Exhibit A). Roosevelt Adjunct Faculty Organization

specified May 2, 2011, as the deadline to respond to Roosevelt University's final settlement

offer which Plaintiff rejected as wholly unsatisfactory. On May 10, 2011, Roosevelt Adjunct

Faculty Organization notified Plaintiff that it was withdrawing, without prejudice, the

grievances filed on behalf of Plaintiff. Therefore, pursuant to § 160(b) of the LMRA, this case

is timely filed within six (6) months after the exhaustion by Plaintiff of all contractual

remedies.

2. Venue is proper in the United States District Court for the Northern District of

Illinois pursuant to 28 U.S.C. §1391(b) and (c) since a substantial part of the events or

omissions giving rise to the claim occurred in Illinois, including the unlawful termination

practices which are the subject of this Complaint. Plaintiff is a resident of Illinois, and

Roosevelt University is subject to personal jurisdiction in Illinois. Jurisdiction is proper as to

Roosevelt Adjunct Faculty Organization, pursuant to 29 U.S.C. § 185, as the Northern District

of Illinois is a district in which its duly authorized officers or agents are engaged in

representing or acting for employee members. Plaintiff was employed by Roosevelt

University in the State of Illinois.

## II. PARTIES

3. Plaintiff, ROBERT KLEIN ENGLER, began teaching at Roosevelt University

as an adjunct professor in 1999 and his employment was terminated on August 10, 2010.

4.     Defendant, ROOSEVELT UNIVERSITY (hereinafter "Roosevelt") is an independent, non-profit, metropolitan university with two distinct campuses located in downtown Chicago and suburban Schaumburg, Illinois.

5.     Defendant ROOSEVELT ADJUNCT FACULTY ORGANIZATION, an affiliate of the Illinois Education Association and the National Education Association (hereinafter "RAFO") is the sole and exclusive bargaining representative for all per-course part-time faculty of Roosevelt University and is located in Chicago, Illinois.

### III.  FACTUAL BACKGROUND

### A. Plaintiff's Teaching Career

6.     Plaintiff is 68 years old. He received Masters and B.A. degrees from the University of Illinois, and a Masters of Divinity degree from the University of Chicago Divinity School in 1977. Plaintiff has a distinguished teaching career spanning 42 years.

7.     Plaintiff was employed continuously by Roosevelt since his appointment as an adjunct professor on January 20, 1999, until his termination by Roosevelt on August 10, 2010. Plaintiff taught and served in the field of sociology during his entire employment with Roosevelt.

8.     Until the controversy that is the subject of this lawsuit, Plaintiff, to his knowledge, had never been the target of any complaint or disciplinary proceeding, and he could be proud of an impeccable and unblemished record of service and professionalism to Roosevelt and its students.

9.     Plaintiff knew the subject matter of his courses; he encouraged students to ask questions; he encouraged individual thinking and differences of opinion; and he conducted his

3

classes fairly and with respect accorded to age, gender, disability, nationality, race, religion, and sexual orientation.

10.    Plaintiff was a member of RAFO continuously since the organization's establishment in approximately 2001. At the time of Plaintiff's termination by Roosevelt he was a dues-paying member of RAFO and a member in good standing.

11.    At all times relevant hereto, Roosevelt and RAFO were signatories to a collective bargaining agreement effective as of August 15, 2008, and in effect until August 14, 2012 (the "CBA") under which all of the adjunct faculty, including Plaintiff, were intended third party beneficiaries (Exhibit B).

12.    Plaintiff was most recently paid $4,705 per class pursuant to the CBA.

13.    Plaintiff taught one class during the Spring 2010 semester, his last semester of employment at Roosevelt.

### B. Events Prior to Plaintiff's Unlawful Termination

14.    For the Spring semester of 2010, Plaintiff taught a class entitled *City and Citizenship*. The course description read: *"History, political economy, and architecture of US cities in relation to historical and philosophical debates about citizenship and democracy. Broad social, economic, and political issues in the US; urban processes and institutions that make for broader sociopolitical stability and change. May be used to fulfill a signature course."*

15.    During the Spring semester of 2010, Plaintiff learned *City and Citizenship* would not be offered by Roosevelt for the Fall 2010 semester.

4

16.     Plaintiff sent an email on March 7, 2010, to Michael T. Maly, Chair and Associate Professor, Department of Sociology (hereinafter "Maly"), wherein Plaintiff expressed his disappointment that *City and Citizenship* would not be offered. However Plaintiff also advised Maly that he would be available to teach other courses, and specifically suggested *Contemporary Social Issues* as well as *Introduction to Sociology*. Both were classes Plaintiff had taught in the past and both were classes listed on Roosevelt's Fall 2010 Course Schedule.

17.     Maly responded to Plaintiff via an email that read in part, *"I am awaiting word on a funding stream for a potential ½ time visiting faculty position that would cover this. Until I hear about this, I am not staffing those sections."* During his entire service at Roosevelt, Plaintiff had never heard any reference to, or concerns regarding, a *"funding stream."* To this day, Plaintiff has neither read nor heard of that term being used again in the context of class assignments at Roosevelt.

18.     Article 4E of the CBA requires Roosevelt to send adjunct faculty written notice of the proposed assignments for regularly scheduled classes by June 30 for the Fall term.

19.     Plaintiff grew increasingly anxious as he had no class assignments for Fall as June 30, 2010, approached.

20.     Approximately the beginning of May 2010, Plaintiff reviewed Roosevelt's website and observed that another adjunct professor had been assigned two classes for the Fall semester, both of which Plaintiff was qualified to teach, and one of which Plaintiff had specifically requested from Maly.

21.     On May 13, 2010, Plaintiff received a phone call from Maly informing Plaintiff that a "harassment complaint" had been lodged against him by one or more students. Plaintiff's attempts during that telephone call to obtain even basic details regarding the nature or subject matter of the "harassment complaint" from Maly were rebuffed. After repeated attempts by Plaintiff to simply learn what he was being accused of, Maly told Plaintiff that he couldn't tell him any more and that he had already told Plaintiff too much.

22.     On May 20, 2010, Maly emailed Plaintiff requesting information regarding a grade Plaintiff assigned to Anwar Taylor (hereinafter "Taylor"), a student who reportedly had complained about his grade. It was Plaintiff's assumption at the time, since confirmed, that this grading matter was separate and distinct from the completely ambiguous "harassment complaint" referenced seven days earlier by Maly on the telephone.

23.     On May 22, 2010, Plaintiff advised Maly by email that the information requested regarding Taylor's grade would be forthcoming. On May 24, 2010, Plaintiff emailed Maly the grade related information as promised, and also sent Maly a copy of Taylor's final exam via Registered Mail. Plaintiff received no further inquiries from Maly or Roosevelt regarding Taylor's grade. Plaintiff assumed the matter was settled. Plaintiff has no knowledge as to whether the subject student's grade was changed or not.

24.     On July 6, 2010, RAFO sent an official notice to Roosevelt of its intent to file a grievance on behalf of Plaintiff as he had not received a course assignment for the Fall 2010 semester. The letter from Joseph Fedorko, RAFO Grievance Chair and Vice President (hereinafter "Fedorko"), stated that the CBA had been *"violated in several respects (most obviously Article 4E, but also possibly 4H and 4K and others.) The issues in dispute are*

*ignoring the length of service in scheduling, sending no assignments and disciplining (i.e., not giving a course to teach) without a meeting or even a conversation."* (Exhibit C)

25.     From July 17, 2010, through and including August 5, 2010, Deborah Ford, Roosevelt Vice President, Human Relations (hereinafter "Ford"), attempted on more than one occasion to schedule an in-person meeting with Plaintiff to discuss an unspecified "harassment complaint." Plaintiff was also advised the meeting could involve disciplinary action.

26.     On numerous occasions from July 17, 2010, to and including August 5, 2010, Plaintiff sought cooperation with Roosevelt. Plaintiff advised Ford he was open to an in-person meeting but Plaintiff continued to ask that he be told at least the basic substance of the "harassment" allegation(s) reportedly made against him so he could properly prepare for the meeting, especially since Plaintiff was being threatened with possible disciplinary action.

27.     Also on July 17, 2010, Plaintiff advised Ford by email that he wished to have Frank Brooks present as his RAFO representative at any meeting.

28.     On July 22, 2010, Ford emailed Plaintiff that *"In terms of course assignments for Fall 10 there simply was no course to assign you."* Again, no further mention of any "funding stream" concerns by Roosevelt.

29.     On July 23, 2010, Ford emailed Plaintiff advising him that a meeting to discuss the still unspecified "harassment complaint" had been scheduled for August 6, 2010. Later that same day, Frank Brooks advised that he would be out of town and unavailable on August 6. Two other union representatives, Dave Walter (hereinafter "Walter," and who on

information and belief is no longer employed with RAFO) and Fedorko, were assigned without Plaintiff's input. Plaintiff never met either individual in person as of that date.

30.     Faced with the prospect of attending a meeting regarding "harassment" allegations that were completely unspecified and with union representatives he had not met or vetted, Plaintiff grew increasingly concerned. Plaintiff's requests that his Step One grievance regarding unassigned classes be dealt with prior to any "disciplinary meeting" also continued to be ignored. On August 5, 2010, Plaintiff emailed Ford and advised her he could not attend a meeting the next day.

31.     Between May 13, 2010 (date Plaintiff was first told of existence of an unspecified student complaint) and August 5, 2010, Plaintiff conferred with Roosevelt and RAFO on numerous occasions by telephone and email. It was Roosevelt who did not cooperate with Plaintiff. Roosevelt refused to tell Plaintiff anything about the alleged complaint despite Plaintiff's repeated requests.

32.     Just two examples of Plaintiff attempting to learn what he was being charged with are emails from Plaintiff to Ford dated July 17, 2010 and August 4, 2010, and incorporated herein as Exhibit D.

33.     Roosevelt's own internal policies, including its Anti-Harassment Policy dated May 16, 2007 (Exhibit E), did not preclude Ford from informing Plaintiff of the specific allegations made against him. The exception is the name of any student filing a complaint which Plaintiff agrees is appropriately kept confidential.

34.     Article 5B of the CBA encourages *"an employee and the employee's immediate supervisor to resolve problems through free and informal communications."*

8

35. Despite Plaintiff's good faith efforts and Roosevelt's own internal policies, Roosevelt refused to cooperate with Plaintiff.

36. On August 6, 2010, at 1:02 p.m., Fedorko emailed Ford regarding what he termed a "disciplinary meeting" scheduled for later that day. Fedorko's email stated, *"Our last communication was a little more ambiguous than this one. However, as you know we have a disciplinary meeting scheduled in your office at 2:30. I will be there and Dave [Walter] will be there. If we are there and Robert [Engler] is not, I suspect the rest of the afternoon will become much clearer for everyone involved. So we'll have our answer at 2:30 what will happen from there. See you at 2:30."*

37. On August 6, 2010, Roosevelt officials met with RAFO representatives Walter and Fedorko in the absence of Plaintiff for a "disciplinary meeting" at 2:30 p.m. A Step One grievance meeting was reportedly scheduled for 3:30 p.m. that same day involving the same parties. Plaintiff has no knowledge regarding what was discussed at those meetings, but on information and belief the two RAFO representatives in attendance obtained no details whatsoever regarding the nature of the "harassment" allegation(s) reportedly leveled against Plaintiff by one or more students. Plaintiff does not know what, if any, attempts were made by Fedorko and Walter at the subject meeting to obtain information on Plaintiff's behalf or to resolve the issue of no course(s) being assigned to Plaintiff for Fall 2010 in violation of the CBA.

38. On August 10, 2010, Maly notified Plaintiff that his employment with Roosevelt was terminated immediately. The firing was performed by email wherein Maly

advised Plaintiff the termination was *"for refusal to cooperate with a formal University investigation."*

### C. Events Subsequent to Plaintiff's Unlawful Termination

39.     A Step One grievance regarding Plaintiff's termination was filed by RAFO on September 1, 2010.

40.     Walter emailed Plaintiff on September 5, 2010, advising Plaintiff that RAFO had filed the grievance for wrongful termination on Plaintiff's behalf. Walter's message went on to say *"Our position is that the contract does not permit nor does it allow termination for refusal to cooperate with a formal University investigation."* (Exhibit F)

41.     A Step One grievance meeting was scheduled for September 27, 2010. However, when Plaintiff appeared at the meeting with personal counsel recently retained, Roosevelt officials immediately cancelled the meeting.

42.     In a press release dated September 29, 2010, Roosevelt brags about hiring 26 new faculty members that Fall, including 13 in the College of Arts and Sciences. The same press release states that 77 new faculty hires have been made since 2008. Roosevelt President Charles Middleton stated, *". . . our new faculty members are an important part of the University's exciting transformation."* [1]

43.     At a rescheduled Step One grievance meeting on October 5, 2010, Roosevelt was represented by Anna Wermuth, outside counsel. At that meeting, nearly two months after Plaintiff's firing, Plaintiff was for the first time provided basic details regarding the alleged harassment claim.

---

[1]     *Roosevelt University hires 26 new faculty members*, Roosevelt University, News and Events (September 29, 2010).

44.     Ms. Wermuth stated that a student complained about a joke which Plaintiff relayed in class at the end of the spring semester earlier that year. According to Ms. Wermuth, the joke was substantially as follows: *"A group of sociologists did a poll in Arizona regarding the state's new immigration law. Sixty percent said they were in favor, and 40 percent said, 'No hablo Ingles.'"*

45.     Throughout his decades-long tenure as a successful and distinguished teacher, Plaintiff has found the occasional use of humor to be a valuable teaching tool for establishing a classroom climate conducive to learning as humor can serve to help document social conflicts. Since his first employment as a teacher in 1968, Plaintiff has never received a student complaint about his lecture content, humor, or teaching methods, until now.

46.     Plaintiff acknowledges relaying the subject joke, in substantially the form cited above, as part of a classroom discussion on the reading assignment of immigration and a related new law in Arizona.

47.     By email dated October 15, 2010, Lynn Weiner, Dean, College of Arts and Sciences (hereinafter "Weiner"), summarized her version of the October 5, 2010, Step One grievance meeting regarding Plaintiff's termination. Weiner also advised Plaintiff and RAFO that Roosevelt was denying the grievance.

48.     By letter dated November 1, 2010, Fedorko advised Weiner that RAFO was filing a new Step One grievance on behalf of Plaintiff and stated in pertinent part, *"RAFO believes Mr. Engler did not receive a course assignment for the Fall 2010 semester in violation of Sections 4H and 4K of the RAFO Collective Bargaining Agreement. The issues in dispute are disciplining Mr. Engler without first receiving a hearing in regards to alleged*

11

*violations first discovered by RAFO in a meeting between Mr. Engler, RAFO, and the administration on 5 October 2010."*

49. By letter dated November 2, 2010, Fedorko advised James Gandre, Roosevelt Provost, that RAFO was filing a Step Two grievance on behalf of Plaintiff regarding his employment termination. Fedorko's letter stated in pertinent part, *"RAFO contends that the University does not have the authority to terminate Engler based on non-participation in an investigation and/or refusing to attend a meeting. As a remedy, RAFO asks that Mr. Engler's termination be immediately reversed and that he be made whole for any loss that may have resulted from this action."*

50. On November 3, 2010, Fedorko sent Plaintiff an email confirming that on November 1, 2010, RAFO filed a Step One grievance *"that, in essence, charges that Roosevelt did not assign you a class for the Fall 2010 semester as punishment for the student complaints received in the Spring, 2010 semester,"* and further that on November 2, 2010, RAFO filed a Step Two grievance *"that questions Roosevelt's authority to fire you for not participating in an investigation."*

51. Roosevelt failed to schedule a meeting with Plaintiff within ten days of the filing of the Step Two grievance (filed by RAFO on November 2, 2010) as required by Article 5, Paragraph C1 of the CBA.

52. On December 16, 2010, Barry Tusin, Interim IEA Staff, advised Roosevelt counsel by email in pertinent part that RAFO *"was not satisfied with the Step Two denial of the Engler grievance and has decided to move this grievance to arbitration. This email shall serve as the written demand for final and binding arbitration and is followed by notice to the*

*American Arbitration Association to request AAA to act as the administrator of the*

*proceedings and that the arbitrator be selected in accordance with its procedures. The*

*contact person for RAFO for this matter is Barry Tusin, Interim IEA Staff. After December*

*22nd, 2010, the contact person on behalf of RAFO will be Bill Silver, Interim IEA staff."*

53.     On January 5, 2011, Fedorko emailed Plaintiff in response to Plaintiff's

inquiries about the arbitration process and Roosevelt's violation of Article 4A of the CBA

which protects Academic Freedom. Fedorko responded in pertinent part: *"On the academic*

*freedom question ... at this point we would not be making that argument because, even at this*

*stage, Roosevelt admits that there has never been a formal investigation into the entire*

*matter. All the discussions that have taken place are 'informal' since neither you nor*

*Roosevelt has, as far as I can tell, talked to any of the students about the joke. As a result, we*

*can't file a grievance based on speculation - only what is formally known by all sides. Once*

*such an investigation were to happen -- IF such an investigation happened -- we would*

*certainly be by your side, and we keep all our options open, including filing any other*

*grievances that would emerge as a result of that investigation."*

54.     On January 19, 2011, Fedorko advised Plaintiff that Bill Silver, Special Higher

Education Organizer, Illinois Education Association (hereinafter "Silver"), would be in

charge of scheduling Plaintiff's arbitration proceeding.

55.     On January 25, 2011, Fedorko emailed Plaintiff and stated in pertinent part,

*"We have always asked for reinstatement and for grievants to 'be made whole' (which refers*

*to length of service and whatnot) as part of every grievance – and by all means you should*

*ask to be reinstated. However (and Dave Walter told this to you back in October) it would be*

*unrealistic to expect that you would be reinstated as a result of any settlement. That's what's happened in the time we have been in existence, most of which being while [Roosevelt President Charles] Middleton has been in charge."*

56.    On March 10, 2011, after nearly three months and repeated requests made by Plaintiff and his counsel for information about the status of the Step Three grievance and arbitration, Silver finally emailed a copy of the Step Three grievance documenting that request. It had been submitted to Roosevelt on December 16, 2010, by Silver's predecessor on the case at RAFO.

57.    On March 14, 2011, Plaintiff and counsel met with RAFO representatives, including Silver, Fedorko, and LuAnn Swartzlander-Kraus, RAFO President (hereinafter "Swartzlander-Kraus"), at the offices of the Illinois Education Association in Chicago to discuss the case, and Plaintiff assumed a pending arbitration hearing would be the focus. However nearly the entire meeting was devoted to Plaintiff and his counsel answering questions about the history of the case, all information that Plaintiff assumed was in RAFO's own files and long known to the attendees from RAFO.

58.    On April 4, 2011, Plaintiff received a letter from Fedorko advising that RAFO would no longer be pursuing any grievance, and allowed ten (10) days for appeal. This came after Plaintiff placed reliance upon RAFO and held a good faith belief for nearly a year that RAFO was working in Plaintiff's interest. In its letter RAFO now parroted Roosevelt's talking points regarding the reason for Plaintiff's termination.

59.    Plaintiff appealed RAFO's decision on April 6, 2011.

14

60.     On April 14, 2011, Plaintiff and counsel met with members of the RAFO Executive Committee at the offices of the Illinois Education Association in Chicago to discuss the appeal. Once again Plaintiff through counsel urged RAFO to stand-up for the CBA and to pursue arbitration as RAFO itself had called for in a letter to Roosevelt dated December 16, 2010, notifying the employer of a Step Three grievance on behalf of Plaintiff.

61.     On April 25, 2011, Plaintiff received by email a letter dated April 22, 2011, advising that RAFO would not pursue Plaintiff's case further, and advising Plaintiff he had until May 10, 2011 to accept an unsatisfactory settlement offer Roosevelt had previously put on the table without change.

62.     On May 10, 2011, Plaintiff formally rejected Roosevelt's settlement offer as unserious and wholly unsatisfactory on its face.

63.     The subject "settlement offer" was finalized with absolutely no input from Plaintiff, and in conjunction with RAFO's repeated representations to Plaintiff that reinstatement was unrealistic, without precedent at Roosevelt, and presumably not worth RAFO pursuing.

64.     RAFO's claims to the effect that Roosevelt "never reinstates" conflict with the analogous case of Douglas Giles, an adjunct professor who was terminated by Roosevelt in 2005 and later offered his job back. Current RAFO officials also had an active role in the Douglas Giles matter, including current RAFO President Swartzlander-Kraus, then-Vice President and Grievance Chair. (*See* Paragraph 113 of this Complaint for more on the discriminatory and arbitrary treatment of Plaintiff by Roosevelt and RAFO, in comparison to Douglas Giles.)

15

65.     On May 10, 2011, Silver sent an email to Swartzlander-Kraus, stating that RAFO was withdrawing, without prejudice, the grievances filed on behalf of Plaintiff, thereby exhausting all contractual remedies under Article 5 of the CBA.

66.     In response, Swartzlander-Kraus emailed Silver back that same day: *"Thank you Bill; it's lovely. See you at dinner TOMORROW night at Petterino's at 7. Then, we toast."* Swartzlander-Kraus also copied Plaintiff on that email, apparently inadvertently (Exhibit G).

67.     On May 11, 2011, Fedorko emailed his fellow RAFO Executive Committee members (and copied Plaintiff, deliberately so, based on information and belief). Fedorko's email openly mocked Plaintiff thusly with indisputable evidence of bad faith, animus, and hostility, *"I say we start a couple of pools; over/under on (a) when the frivolous lawsuit gets filed; (b) how much it will be (I call 'over $500,000'); and (c) how many people will be named as co-defendants ... "* (Exhibit G)

68.     On May 16, 2011, Plaintiff filed an unfair labor practices charge against RAFO with the Chicago Regional Office of the National Labor Relations Board. The complaint was dismissed by that office on June 29, 2011. Plaintiff appealed that decision to the National Labor Relations Board, Office of the General Counsel, on July 13, 2011. The appeal was denied on August 24, 2011.

### D. Roosevelt's Professional Code of Conduct

69.     Employees of Roosevelt are subject to a Professional Code of Conduct (undated) (Exhibit H).

70.     Paragraph 2 of such Code states that it *"does not constitute a contract, and nothing contained in this document is an enforceable promise of any kind. Rather, this document is intended solely for informational purposes and may be revised by the University at any time, for any reason, without prior notice."*

71.     Paragraph 9, Item 17 of such Code lists *"Refusing to cooperate in a formal University investigation"* as an example of conduct that may result in termination. The Code does not define "cooperate" or "formal" or even "investigation."

72.     The Code states that it is subject to various other Roosevelt policies, including a Sexual Harassment Policy.

### E. Roosevelt's Anti-Harassment Policy

73.     Employees, applicants, and students of Roosevelt are subject to an Anti-Harassment Policy dated May 16, 2007 (Exhibit E).

74.     Paragraph 2 of the Policy is entitled "Investigation of a Complaint" and states in pertinent part, *"The Vice President of Human Resources or the Associate Vice President for Student Services shall undertake an investigation by appointing another administrator or other qualified person to conduct the investigation. . . The investigator shall file a written report of his/her findings within thirty (30) working days after the complaint has been made. In the event the report cannot be completed within thirty (30) working days, the report shall state the reasons for the delay."*

75.     On Plaintiff's information and belief, no "investigator" was ever appointed by the Vice President of Human Resources or any other Roosevelt administration official. Plaintiff also has no knowledge of an investigation being performed or a written report issued

regarding any allegations or complaint made by any student against Plaintiff as required by the Anti-Harassment Policy.

76.     Defendants claim Plaintiff was terminated for "refusing to cooperate in a formal University investigation," meanwhile for months Plaintiff was denied all knowledge as to what was purportedly being "investigated," and serious questions remain as to whether Roosevelt ever even conducted an investigation as prescribed by its own internal policies. Roosevelt's stated reason for firing Plaintiff is indicative of a pretext if there was in fact never an investigation for any party to "cooperate with."

### F.  Constitution of the Roosevelt University Faculty

77.     All members of the Roosevelt faculty are subject to the Constitution of the University Faculty, as most recently ratified by the University Senate on April 15, 2009, and having an effective date of June 16, 2011 (Exhibit I).

78.     Section E of the Constitution addresses Academic Freedom and Paragraph 1 of such section states: *"Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching topics that have no relation to their subject."*

79.     The harmless humor relayed by Plaintiff to an entire classroom of students related to a recently adopted Arizona immigration law that was the topic of discussion that day in a class entitled *City and Citizenship*. Defendants have not even attempted to assert that Plaintiff ever relayed comments that were not related to the classroom subject material.

18

### G. Constitution of RAFO

80.     RAFO's website contains the union's Constitution (undated). Article VII is entitled "Arbitration and Grievance Appeal" and states in full, *"Based on the recommendation of the vice president (grievance chair), the executive committee will decide whether a grievance will be processed to final and binding arbitration. If the executive committee decides not to arbitrate a grievance, the grievant has the right to appeal this decision in person before the executive committee."*

81.     RAFO's Vice President and Grievance Chair is Joseph Fedorko, the individual responsible for grievance recommendations and the same individual who openly mocked Plaintiff as described in ¶ 67 of this Complaint.

### IV.  THE INJURIES SUSTAINED BY PLAINTIFF

82.     Each of the adverse actions outlined above, from Roosevelt's refusal to cooperate with and to inform Plaintiff, to multiple breaches of the CBA by Roosevelt including denial of due process and termination of Plaintiff's employment, to RAFO's absolute abandonment of its long-time dues paying member, collusion with the employer, bad faith, discriminatory treatment, and failure to defend Plaintiff's contractual rights, all had their genesis in one harmless, non-offensive joke relayed to an entire classroom of university students.

83.     Defendants' actions eliminated Plaintiff's source of income, damaged his reputation, caused him physical and emotional injuries, and irreparably injured his constitutional rights to free speech, academic freedom, due process of law, and equal protection of law.

84.     It is extremely distressing to Plaintiff that his name is linked on campus, the Internet, and likely elsewhere with allegations of "offensive," "harassing," and/or "racist" conduct. Even while still employed by Roosevelt, Plaintiff had to endure months of hearing rumors circulating on campus about him regarding "harassment," knowing they were untrue, but finding it impossible to respond to unknown charges. No amount of diligence and discovery by Plaintiff, in the context of litigation or otherwise, could ever determine the extent to which his name is now linked with those allegations in the minds of people, known and unknown to him.

85.     Plaintiff has also been irreparably harmed in his chosen profession as a university teacher. Not only are accusations of offending a student toxic to any opportunity for employment, especially within the academic community for which Plaintiff received his training, but accusations like those made by Defendants poison his opportunities in the field of higher education teaching. While Plaintiff has sought to mitigate his damages by attempting to attain other employment, he desires reinstatement at Roosevelt under circumstances in which his constitutional and contractual rights, as well as academic freedom will be protected. In addition, he desires damages for the injuries sustained as a result of Defendants' unlawful and tortuous conduct.

## V. CAUSES OF ACTION

### COUNT I
### (Breach of Article 4A of the Collective Bargaining Agreement against Roosevelt)

86.     Plaintiff reasserts the foregoing allegations and incorporates them herein.

87.     Article 4A of the CBA states in its entirety as follows:

20

### *Academic Freedom*

*An adjunct faculty member shall have full freedom to conduct classes consistent with the course description or outline and established academic policies or standards. Outside of the classroom, an adjunct faculty member, as a citizen, shall be able to speak or write free from institutional censorship or discipline. An adjunct faculty member's right to academic freedom as described in this section is at all times subject to his or her ability to perform his or her duties for the University. Prior to resolving any dispute as to the application of this section through the grievance procedure of this Agreement, the parties shall utilize the general University procedures on Academic Freedom. Upon the completion of the general University procedures on Academic Freedom, the adjunct faculty member or Union may file a grievance regarding this Section of the Agreement through the grievance procedure of this Agreement if he or she is dissatisfied with the outcome of the general University procedures on Academic Freedom. Only adjunct faculty members eligible for remediation, however, shall be able to utilize the arbitration provisions of the grievance procedure of this Agreement.*

88.     Plaintiff relayed a joke to his *City and Citizenship* class during the Spring Semester of 2010. The joke was harmless in nature and substantially identical to countless jokes on similar topics told nightly by Jay Leno, David Letterman, and other talk show hosts. In fact the President of the United States Barack Obama told this joke at the White House Correspondents' Association Dinner in 2010: *"We all know what happens in Arizona when you don't have ID . . . Adios amigos."*

89.     On the day Plaintiff relayed the subject joke, Plaintiff's class was discussing Arizona's new immigration law which is entirely consistent with the published syllabus for the class *City and Citizenship*. It's hardly unexpected that class discussion might include humor related to a topic of current interest, i.e. immigration. The joke was not directed towards any individual student or group. It was relayed to an entire class. While Plaintiff has never received any results of any investigation and Roosevelt has always kept Plaintiff in the dark regarding almost all facets of this matter, it is Plaintiff's understanding based on

21

information and belief that only one student in the entire class had an issue with the subject joke. That student, Christina Solis, would later voluntarily identify herself as the source of the complaint. Ms. Solis went on record with public criticism of Plaintiff in Roosevelt's student newspaper the *Torch*. [2]

90.     Even by the possibly hyper-sensitive standards of today's academic community, the joke allegedly relayed by Plaintiff to an entire classroom of university students did not come close to violating any reasonable community standard as to what constitutes offensive or harassing conduct. In any case, the entire university experience would lose all meaning and value for both students and faculty if professors and instructors had to worry that anything they might say in class could lead to a complaint and dismissal. It is precisely that kind of chilling effect on free speech and intellectual inquiry that Article 4A of the CBA seeks to guard against.

91.     Roosevelt acted unreasonably by lumping Plaintiff in with true "harassers." Roosevelt not only blatantly violated the CBA's guarantee of Academic Freedom, it defamed and humiliated Plaintiff by subjecting him to the mechanism through which legitimate harassment complaints should be investigated. Roosevelt has an implied duty to internally review any student complaint filed, and to exercise reasonable judgment in deciding which complaints warrant further investigation. Roosevelt not only failed in that duty, there is no evidence that Roosevelt even conducted an investigation as prescribed by its own internal policies.

---

[2]     Gregory Hess, *Student comes forward about fired professor,* Torch (November 15, 2010).

92.     Under no reasonable reading of Roosevelt's Anti-Harassment Policy dated May 16, 2007, could a topical, harmless joke be deemed to constitute "harassment" – especially when read in conjunction with the CBA's guarantee of Academic Freedom.

93.     Roosevelt's claim that Plaintiff was fired for "refusing to cooperate with a formal investigation" is absurd on its face, as even assuming Roosevelt's version of events as true, there was in fact no "harassment" to investigate.

94.     A reasonable question is presented in this case as to whether Roosevelt's purported reason for firing Plaintiff was in fact a pretext intended to disingenuously disguise some other bad faith motivation for Plaintiff's termination.

<div align="center">

**COUNT II**
**(Breach of Article 4E of the Collective Bargaining Agreement against Roosevelt)**
</div>

95.     Plaintiff reasserts the foregoing allegations and incorporates them herein.

96.     Article 4E of the CBA states in its entirety as follows:

**Assignments**

*In making course assignments among adjunct faculty, for the first six semesters hours of an adjunct faculty member's teaching load, the University shall consider the length of service at the University based upon the number of semesters teaching in the applicable program. In addition the University shall consider such pertinent factors as its institutional needs for specialization and/or pedagogy, teaching effectiveness, and the adjunct faculty members' credentials and/or prior teaching experience in the subject matter of the course, and its staffing and scheduling needs.*

*Beginning with the assignment of classes for the Fall term of the 2002-03 academic year, the University will provide a means by which adjunct faculty may communicate their teaching preferences regarding course days and times, and campus prior to the start of formal planning for each term's courses. These preferences are for information only and do not obligate the University excepts as provided above. The University will send adjunct faculty written notice of the proposed assignments for regularly scheduled classes by June 30*

<div align="center">23</div>

*for the Fall term, November 30 for the Spring term, and March 31 for the Summer terms except for extenuating situations and circumstances.*

*In the hiring of new adjunct faculty, it is understood that both the Union and the University support the goals and practice of affirmative action/non-discrimination.*

97.     Roosevelt breached Article 4E of the CBA by failing to provide Plaintiff written notice of his class assignments for the Fall semester of 2010 by the June 30th deadline specified in the CBA. Plaintiff was qualified to teach more than one class being offered for the Fall 2010 term, and under the CBA and considering Plaintiff's seniority, at least one class should have been assigned to Plaintiff. Roosevelt's breach of Article 4E was compounded by the absence of good faith evident in Roosevelt's dealings with Plaintiff, and Roosevelt's failure to disclose material information crucial to Plaintiff. As a result of Roosevelt's lack of transparency and fair dealing, Plaintiff suffered and continues to suffer significant harm.

## COUNT III
### (Breach of Article 4K of the Collective Bargaining Agreement against Roosevelt)

98.     Plaintiff reasserts the foregoing allegations and incorporates them herein.

99.     Article 4K of the CBA states in its entirety as follows:

### *Student Complaints*

*Any student complaint against a faculty member deemed by Roosevelt to raise the possibility of disciplinary action against the faculty member shall be brought to the attention of the faculty member. The faculty member shall also be given an opportunity to respond to such complaint prior to any disciplinary action being imposed.*

100.    Plaintiff received the most severe disciplinary action possible. His employment was terminated.

24

101.    Roosevelt blatantly breached Article 4K of the CBA as it imposed the harshest disciplinary action available before giving Plaintiff even the barest of detail regarding the complaint leveled against him. In a proceeding reminiscent of *Kafka*, sentence was rendered terminating Plaintiff. Nearly two months later Plaintiff attended a separate proceeding and for the first time is informed of the "charge."

102.    Roosevelt made a mockery of Plaintiff's due process rights, and the truth was turned on its head. Despite Roosevelt's claims to the contrary, it was in fact Roosevelt who refused to cooperate with Plaintiff. Plaintiff was willing to attend a meeting; in fact he was nearly continuously meeting with Roosevelt officials via email and phone calls. Plaintiff simply wanted to know what he was being charged with before he walked into a more formal proceeding. Given Roosevelt's refusal to be open and forthcoming with even the most basic facts, Plaintiff had a good faith suspicion that he was going to be terminated no matter what the charge or evidence. Plaintiff reasonably sought time to learn about the charge and to meet his RAFO representatives, and to retain personal legal counsel if warranted.

103.    Roosevelt also acted in an arbitrary manner as illustrated by the way the Taylor grading matter was investigated in May of 2010. In that case, Maly simply asked Plaintiff to provide some additional information and backup support for a grade assigned by Plaintiff. Plaintiff cheerfully complied and provided Maly with all requested materials within a couple of days. To Plaintiff's knowledge the Taylor matter was easily and entirely settled, with no issues outstanding. It was a simple matter and it was all handled via emails and phone calls between Maly and Plaintiff. Roosevelt proved that it is capable of resolving simple issues through an appropriate mechanism when it so chooses.

104.    To this day, Plaintiff cannot understand why the equally baseless "harassment"
charge did not begin with a simple phone call or email from Roosevelt letting Plaintiff know
specifically what he was being accused of and asking for clarification and explanation, just
like with the Taylor grading example.

105.    An additional breach of Article 4K occurred when Plaintiff was denied classes
for the Fall semester of 2010. While unbeknownst to Plaintiff at the time, by denying classes,
Roosevelt was already administering disciplinary action in response to a baseless student
complaint that Plaintiff would remain unaware of for several more months.

## COUNT IV
### (Breach of Duty of Fair Representation Against RAFO)

106.    Plaintiff reasserts the foregoing allegations and incorporates them herein.

107.    This is not a case where Plaintiff complains simply because the union did not
pursue grievances to arbitration as promised, although it is certainly true that RAFO failed to
do exactly that. In this case, RAFO inexplicably betrayed Plaintiff mid-way through the
process, after encouraging Plaintiff's reliance over many months. The betrayal was total, to
the point where by the end RAFO was merely parroting the disingenuous talking points of the
employer Roosevelt. And once the abandonment of one of their dues paying members was
complete, RAFO's President was unable to hide her joy and emailed Silver that soon they
would "toast." Fedorko piled on more and joked with Plaintiff's former colleagues about
starting a betting pool to guess Plaintiff's next step. Animus, bad faith, discrimination,
arbitrariness, and at times even open hostility were plainly evident in this case from RAFO.

108.    Fedorko is RAFO's Grievance Chair, a position with an extremely important
fiduciary duty to all RAFO members, including the responsibility specified in RAFO's

26

Constitution to make grievance recommendations to the entire Executive Committee. Plaintiff met Fedorko in person for the first time nearly two months after he was fired by Roosevelt. Plaintiff's final contact with his Grievance Chair was the mocking email from Fedorko pushing a betting pool on Plaintiff's case.

109.    At the beginning RAFO appeared to be working in good faith on behalf of Plaintiff. Plaintiff relied to his substantial detriment on RAFO's representations and assurances. Grievances were filed and RAFO advised Plaintiff in writing that its position was that *"the contract does not permit nor does it allow termination for refusal to cooperate with a formal University investigation."*

110.    Plaintiff of course strongly disputes the very notion that he failed to cooperate and reasserts that Roosevelt was in fact the party which refused to cooperate. It was Roosevelt that refused to tell the accused about the charges against him until nearly two months after Plaintiff was fired. It was Plaintiff who sought basic due process and fairness, and it is Plaintiff who has a proven record of responding to questions and requests for information when asked, as in the case of the Taylor grading matter. Roosevelt by contrast deprived Plaintiff of the most crucial of information, i.e., the charges on which Plaintiff was purportedly being investigated.

111.    Initially RAFO appeared to be on Plaintiff's side and defending contractual rights under the CBA. But something changed on or about January 19, 2011. That's approximately the time Silver replaced Walter and Barry Tusin as a lead RAFO representative assigned to Plaintiff's case.

112.    Only after numerous calls to RAFO over many weeks by Plaintiff's counsel was Plaintiff able to obtain confirmation that the promised Step Three grievance was in fact filed, demanding final and binding arbitration. Plaintiff finally learned on March 10, 2011, that RAFO had in fact advised Roosevelt that it was demanding an arbitration hearing. RAFO had made the demand way back on December 16, 2010. RAFO would later adopt Roosevelt's "defenses" as it sought to avoid following through on arbitration proceedings it had itself demanded.

113.    Further evidence that RAFO's conduct towards Plaintiff was arbitrary, discriminatory, and in bad faith can be seen in the way RAFO dealt with a similar case five years ago. Douglas Giles (hereinafter "Giles") was an adjunct professor at Roosevelt. In 2005 Giles' employment with Roosevelt was terminated after a controversy erupted regarding a classroom discussion. But unlike Plaintiff's case, RAFO fought hard for Giles. There was none of the frustration Plaintiff has had to endure where Roosevelt - later joined by his union - on their own decided that near constant phone and email contact constitutes non-cooperation by Plaintiff.

114.    During the Giles matter, RAFO publicly accused Roosevelt of adopting a pretext for the firing. Despite that past experience and suspicions regarding Roosevelt, RAFO never seriously considered that similar motivations might be at work in Plaintiff's case.

115.    Thanks to RAFO, coupled with pressure from students and the public, Roosevelt eventually reversed its decision and offered Giles his old job back. RAFO's representations to Plaintiff that reinstatement would be "unrealistic" or unprecedented are in direct contradiction with RAFO's own recent experience. RAFO remains so proud of that

28

victory information is still posted about the Giles case on RAFO's website. Any adjunct faculty member employed by Roosevelt reviewing those website materials would be reasonable in relying upon RAFO's representations that it is serious about defending academic freedom and other contractual rights in the same manner RAFO demonstrated with respect to Giles (Exhibit J).

116.    During the Giles matter, RAFO's then-President Beverly Stewart stated as set forth in Exhibit J, *" RAFO believes that the accusations of teaching incompetence against Douglas Giles are manufactured in an attempt to cover up the academic freedom violation. The accusations are dubious, and in the process of making them, Roosevelt has committed two additional violations of the union contract. . . These violations lend credence to our contention that Douglas Giles was actually terminated for the reasons testified to in the academic freedom grievance, despite Roosevelt's attempt to divert attention from it with unsubstantiated claims of teaching incompetence."*

117.    Despite the glaringly parallels evident in Roosevelt's treatment of two adjunct faculty members and clear evidence of a pattern and practice whereby Roosevelt disguises blatant violations of academic freedom, RAFO could not have treated the two cases more differently.

118.    RAFO fought and won for Giles by maintaining a healthy and appropriate adversarial relationship with the employer. In Plaintiff's case, RAFO at some point dropped any adversarial pretense and simply colluded with Roosevelt.

119.    Further evidence of such discriminatory treatment is found in the final formal letter Plaintiff received from RAFO dated April 22, 2011, wherein author Fedorko has fully

29

adopted Roosevelt's position and criticizes Plaintiff for not attending an investigatory meeting regarding the charges. Fedorko is no longer troubled by the fact Plaintiff had no idea what those charges were at the time of that meeting. However what's most troubling is that Fedorko neglects to mention that he himself was in attendance at the meeting in question, along with a second representative from RAFO. Both were presumably there on Plaintiff's behalf. Yet somehow neither one obtained any information that could have been helpful to Plaintiff, for example the nature of the charge, the status of Plaintiff's class assignments, or anything regarding the "funding stream" claim.

120.    In December of 2010, RAFO filed a Step Three grievance and was committed to arbitration. Then something changed early in 2011. One theory Plaintiff would explore through discovery is the good faith belief that Plaintiff was retaliated against for holding political views significantly more conservative relative to most of his RAFO colleagues.

121.    Plaintiff is a published author on many subjects including poetry and literature. He has twice won the Illinois Arts Council Literary Award (1989 and 1996). Plaintiff's work can readily be found on the Internet and elsewhere. Plaintiff also publishes on politics and is recognized by some as a leading conservative thinker and writer in Chicago. Plaintiff has published viewpoints that are not always in lockstep with some in the labor movement.

122.    While discovery would obviously be necessary before making a specific allegation, it can be noted that the big turnaround in RAFO's representation of Plaintiff coincided precisely with the well publicized pro-labor rallies in Madison, Wisconsin earlier this year. Fedorko and other Chicago union leaders were quite open and proud of their participation in those events. Plaintiff of course supports the work of union leaders and

30

members in defense of collective bargaining rights. Plaintiff merely wishes his RAFO
representatives had taken their own CBA more seriously.

123.    Plaintiff rejected what he considered an unserious settlement offer from
Roosevelt as wholly unsatisfactory. First of all, a "neutral letter of reference" is what any
employee would receive in any case. The second part of the offer was a mere two classes
worth of back pay. Because of the collusion between Roosevelt and RAFO, Plaintiff has been
recklessly defamed and is now falsely branded as a "harasser" and "racist."

124.    The single best way for Plaintiff to begin repairing the damage recklessly
inflicted upon his reputation would be via reinstatement. Roosevelt's settlement offer
completely ignored this most vital and obvious remedy. As Plaintiff advised Fedorko by email
on January 25, 2011, *"I'd like to ask for reinstatement to my position as part of a settlement,
among other things. I ask this because I'm interested in defending my reputation, especially
against what I believe are false and baseless harassment charges. . . Damage to my
reputation weighs more on me than just loss of income."*

125.    Plaintiff's prospects for other employment at another college or university are
slim. Plaintiff's reputation is more important to him than money. Absent reinstatement, an
appropriate remedy must include compensation adequate to restore the lost wages Plaintiff
can be expected to suffer for the rest of his life. Plaintiff loves teaching and had no plans to
retire.

126.    Plaintiff is fully aware that no arbitration proceeding comes with any
guarantees. However Plaintiff deserved his day in that "court" and he reasonably relied upon

RAFO's representations that his case would have that impartial hearing before a neutral arbitrator. Plaintiff was optimistic about his prospects but was willing to accept the results of a fair proceeding. Because RAFO breached its duty of fair representation, Plaintiff never had that chance to be heard.

127.    As a direct and proximate result of Roosevelt's wrongful discharge and breach of the CBA, and RAFO's breach of the CBA and its duty of fair representation, Plaintiff has suffered severe emotional distress, physical symptoms and manifestations of severe emotional distress, mental anguish, humiliation and other non-economic losses, loss of wages, loss of job, loss of benefits, loss of seniority, and other economic losses. As a further foreseeable result of the wrongful discharge and unfair representation, Plaintiff has suffered irreparable harm to his reputation and has been forced to seek legal counsel, and incur expenses of attorney fees and costs, not only in this proceeding, but in all preliminary proceedings in attempting to protect his contractual rights and to protest his discharge.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in his favor and against Defendants, and award him:

(a) back pay and benefits from the date of his termination;

(b) reinstatement or front pay;

(c) economic damages;

(d) non-economic damages;

(e) his attorneys' fees, and all court and other legal expenses associated with this action as permitted by law;

(f)  pre- and post-judgment interest at the highest rate allowed by law; and

(g)  such other and further relief, general or special, at law or in equity, as justice

requires.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS WHERE ALLOWED**

**BY LAW.**

Dated this 2nd day of November, 2011.

Respectfully submitted,


By:  s/Doug E. Ibendahl
Doug E. Ibendahl, ARDC No.: 6229474
165 N. Canal Street, Suite 1215
Chicago, Illinois 60606-1404
Tel: 312.648-0061
Email: dibendahl@mail.com
ATTORNEY FOR PLAINTIFF

Plaintiff's Address:
Robert Klein Engler
1646 River Street, Apt. 308
Des Plaines, IL 60016

33