UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT KLEIN ENGLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 11 C 7488 |
| ROOSEVELT UNIVERSITY and ) | |
| ROOSEVELT ADJUNCT FACULTY ) | Judge John W. Darrah |
| ORGANIZATION, an affiliate of the ) | |
| Illinois Education Association and the ) | |
| National Education Association, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Roosevelt Adjunct Faculty Organization's

("RAFO") Motion for Summary Judgment as to Count IV of Plaintiff

Robert Klein Engler's Amended Complaint. RAFO has also filed Motions to Strike

Engler's Local Rule of the United States District Court, Northern District of Illinois

("Local Rule") 56.1(b)(3)(A) response and Local Rule 56.1(b)(3)(C) statement of

additional facts.

### PRELIMINARY MOTIONS

*RAFO's Motions to Strike for Failure to Comply with Local Rule 56.1*

Based on Engler's failure to comply with Local Rule 56.1(b)(3)(B), RAFO has

moved to strike portions of Engler's Local Rule 56.1(b)(3)(B) response or deem these

facts admitted.[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment

---

[1] In his Local Rule 56.1(b)(3)(B) statement, Engler incorrectly numbered his
paragraphs, and, therefore, his response paragraphs do not correspond to RAFO's

to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party. In the case of disagreement, Local Rule 56.1(b)(3)(B) requires the nonmoving party to cite "*specific* references to the affidavits, parts of the record, and other supporting material." Local Rule 56.1(b)(3) (emphasis added); *see Richards v. Combined Ins. Co. of America*, 55 F.3d 247, 251 (7th Cir. 1995) (observing that non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment."). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Engler has failed to properly dispute the facts set forth in RAFO's Local Rule 56.1(a)(3) statement. In his Local Rule 56.1(b)(3)(B) statement, Engler generically denies or objects to RAFO's factual assertion with an unsupported claim that "there is no evidence in the record to support the claim." (*See, e.g.,* Pl.'s 56.1(b)(3)(A) ¶¶ 11, 24, 26-27, 40.) Engler fails to cite a specific affidavit or portion of the record or produce any evidence to support his denial of RAFO's factual assertion. In other paragraphs, Engler denies RAFO's factual assertion but cites only to his Amended Complaint in support. "On summary judgment, however, the plaintiff can no longer rest on the pleadings," *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (*Behrens*), and must

---

statement. Engler's paragraph "17" responds to RAFO's paragraph "16" and so on for the remainder of his response. For convenience of the Court, all references to Engler's responses will refer to what would be the correctly-numbered paragraphs.

point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties.

Because Engler has not complied with Rule 56.1(b)(3)(A), Engler is deemed to have admitted all of the factual statements in paragraphs 11, 24, 26-27, 40, 32, 45, 46, 50, 57-58. RAFO's Motion to Strike is, therefore, granted in part.

RAFO has also moved to strike portions of Engler's Local Rule 56.1(b)(3)(C) statement of additional facts for failure to comply with Local Rule 56.1.

Local Rule 56.1(b)(3)(C) requires the nonmoving party to submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, *including* references to the affidavits, parts of the record, and other supporting materials relied upon." Engler supports many of his factual assertions with only citations to his Amended Complaint, which is insufficient at summary judgment to show a disputed issue of fact. (*See, e.g.,* Pl.'s Local Rule 56.1(b)(3)(C) ¶¶ 4, 20, 22.) For the most part, RAFO does not object to these statements of fact, and they will not be stricken. (*See id.* ¶ 20.)

RAFO sets forth additional arguments as to why certain paragraphs in Engler's Local Rule 56.1(b)(3)(C) statement should be stricken. As these objections are duplicative of RAFO's response to Engler's Local Rule 56.1(b)(3)(C) statement, the Court considers RAFO's objections in the factual background below. Accordingly, RAFO's Motion to Strike certain paragraphs of Engler's Local Rule 56.1(b)(3)(C) statement is denied.

## BACKGROUND[2]

### *Engler's Allegations*

The following facts are taken from the Parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1. Engler alleges that Defendant, Roosevelt University ("Roosevelt"), unlawfully terminated his employment in breach of its Collective Bargaining Agreement with RAFO ("RAFO CBA"). (Def.'s 56.1(b)(3)(B) ¶ 1.) Engler alleges that RAFO, a labor union, breached its duty of fair representation to Engler. (*Id.* ¶ 2.) Engler brings claims for breach of Article 4A of the RAFO CBA (Count I), breach of Article 4E of the RAFO CBA (Count II), and breach of Article 4K of the RAFO CBA (Count III) against Roosevelt and breach of the fair duty of representation (Count IV) against RAFO.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action is brought under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA").

### *Engler's Employment with Roosevelt*

Engler was employed by Roosevelt as an adjunct professor in the Sociology Department from January 20, 1999, until August 10, 2010. (*Id.* ¶ 3.) Engler taught one

---

[2] Engler states in his response brief that "RAFO's Motion for Summary Judgment . . . is entirely premature. The parties have engaged thus far in only limited discovery." (Resp. at 2.) However, at the status conference on February 8, 2012, the Court asked Engler's counsel whether, pursuant to Federal Rule of Civil Procedure 56(d), he intended to file an affidavit stating that he "cannot present facts essential to justify its opposition." A discussion ensued, and the parties agreed to permit discovery on the issues raised in the Motion for Summary Judgment. Moreover, since that time, Engler has not filed an affidavit pursuant to Rule 56(d), seeking additional discovery as necessary to defend this Motion for Summary Judgment.

class, entitled City and Citizenship, during the Spring 2010 semester and was paid $4,705 per class pursuant to the RAFO CBA. (*Id.* ¶ 7-8.) In March 2010, Engler learned that the City and Citizenship class would no longer be offered by Roosevelt for the Fall 2010 semester. (*Id.* ¶ 9.)

At all relevant times, Engler was represented by a member of RAFO. (*Id.* ¶ 4.) The RAFO CBA contained a grievance procedure, which permitted but did not require RAFO to take an unresolved grievance to arbitration. (*Id.* ¶ 5.) Because Engler was a party to the CBA, he was not an at-will employee. (Pl.'s 56.1(b)(3) ¶¶ 3-4.)

### Complaint Against Engler

On May 13, 2010, Michael Maly, Chair and Associate Professor, Department of Sociology, informed Engler of a harassment complaint that had been filed against Engler by one or more of his students. (Def.'s 56.1(a)(3) ¶ 10.) By email dated May 20, 2010, Deborah Ford, Roosevelt Vice President of Human Resources, sent Engler and RAFO an e-mail notice of a complaint of harassment against Engler and a request to conduct a meeting. (*Id.* ¶ 12.)

From May 20, 2010, through August 5, 2010, Roosevelt attempted on numerous occasions to schedule an in-person meeting with Engler and his RAFO representatives to discuss the harassment complaint and advised Engler that the meeting could involve disciplinary action. (*Id.* ¶ 13.) On July 19, 2010, Ford emailed Engler and RAFO, stating, "As you know, since May 20, 2010, Michael Maly and I have been trying to schedule a meeting with you regarding certain harassment complaints made against you. The University has a legal obligation to thoroughly and promptly investigate such

complaints. Your refusal to meet with us thus far has already begun to interfere with our ability to fulfill those obligations." (*Id.* ¶ 14.) In the same email, Ford warned Engler that if he failed to appear for a meeting on July 22, 2010, his employment with Roosevelt would be terminated as of that date for refusal to cooperate with a formal University investigation. (*Id.* ¶ 15.)

Engler responded to Ford's July 19 email, stating that he would not be available until after July 27. (*Id.* ¶ 16.) Engler requested that Roosevelt resolve his grievance that he had not received a course assignment for the Fall 2010 semester and demanded information, in writing, regarding the harassment complaint, including the identities of the complaining students, before he would be willing to attend any meeting. (*Id.* ¶ 17.) On July 23, 2010, Ford emailed Engler and RAFO, advising that the meeting to discuss the harassment complaint would be re-scheduled for August 6, 2010. (*Id.* ¶ 18.) Engler did not attend the August 6 meeting. (*Id.* ¶ 19.) On August 5, 2010 at 4:15 p.m., Engler sent Ford an email, stating, "It is impossible for me to come to Chicago at this time." (Pl.'s 56.1(b)(3)(C) ¶ 5.)

In an email on July 19, 2010, RAFO representative, Frank Brooks, advised Engler to "schedule this meeting as not doing so might be considered to be insubordination." (Def.'s 56.1(a)(3) ¶ 20.) In an email on August 4, 2010, Joseph Fedorko, the RAFO Grievance Chair, advised Engler to stop communicating directly with Roosevelt and explained to Engler that the purpose of the meeting is to provide him with the specific allegations against him and allow him an opportunity to fully respond. (*Id.* ¶ 21.) In an email on August 5, 2010, Dave Walter, an Illinois Education Association ("IEA")

Uniserv Director assigned to assist RAFO, "strongly suggested" that Engler attend both the investigatory meeting and grievance meeting scheduled for the following day and cease his direct communication with Roosevelt. (*Id.* ¶ 22.) In the same email, Walter warned Engler that if he failed to attend the investigatory meeting, then RAFO would not be able to defend him from Roosevelt's harassment allegations. (*Id.* ¶ 23.)

The Code of Conduct in Roosevelt University Human Resources Policies and Procedures for Administrative Employees, which applies to RAFO-represented employees, provides:

> At any time during employment, there are violations of the Code of Conduct and Core Values that are subject to immediate termination without Formal Coaching or Dispute Resolution Processes. They include, but are not limited to:
>
> * * *
>
> 11. gross dereliction of duties, including insubordination;
>
> * * *
>
> 17. refusing to cooperate in a formal University investigation.

(*Id.* ¶ 24.)[3]

In an email on August 10, 2010, Maly notified Engler that his employment with Roosevelt was terminated immediately "for refusal to cooperate with a formal University investigation." (*Id.* ¶ 25.)

---

[3] Engler responds that RAFO has "provided no evidence that the subject policy was in force during Plaintiff's employment at Roosevelt" but does not present any evidentiary support for this assertion. Engler argues that another policy applied to him during his employment but offers no evidentiary support. (Pl's 56.1(b)(3)(B) ¶ 2.) In any event, both policies provide that "refusing to cooperate in a formal University investigation" is grounds for immediate termination. (*Id.*)

*RAFO Files Grievances*

RAFO generally will file a grievance immediately and investigate the merits of

the grievance later in order to preserve the member's rights under the contract. (*Id.* ¶ 26.)

On September 1, 2010, RAFO filed a grievance challenging Engler's termination. (*Id.*

¶ 27.) RAFO filed three separate grievances on Engler's behalf:

> 1. On July 6, 2010, RAFO filed a grievance regarding
> Roosevelt's failure to assign Engler a class for the Fall
> 2010 semester.
>
> 2. On September 1, 2010, RAFO filed a grievance
> regarding Engler's termination.
>
> 3. On November 1, 2010, RAFO filed a grievance alleging
> that Engler was not assigned a class for the Fall 2010
> semester as punishment for the student harassment
> complaints filed against him.

(*Id.* ¶ 28.)

A Step One grievance meeting was scheduled for September 27, 2010, to discuss

Engler's termination grievance. (*Id.* ¶ 29.) When Plaintiff appeared for the meeting with

his private counsel, Doug Ibendahl, Roosevelt officials postponed the meeting for a later

time when they too could have outside counsel present. (*Id.* ¶ 30.)

On November 1, 2010, RAFO filed another Step One grievance on Engler's

behalf, alleging that the reason why Roosevelt did not assign Plaintiff a class for the Fall

2010 semester was as punishment for the student harassment complaint. (*Id.* ¶ 34.)

On November 2, 2010, RAFO advanced Engler's termination grievance to

Step Two. (*Id.* ¶ 37.) Roosevelt again denied the grievance. (*Id.*) On

December 16, 2010, Roosevelt was notified that RAFO was not satisfied with the

Step Two denial of Engler's termination grievance and that RAFO was advancing the matter to arbitration. (*Id.* ¶ 38.)

<em>Post-Grievance Activity</em>

Bill Silver, an IEA Servicing Representative who took over assisting RAFO, engaged in settlement negotiations with Roosevelt officials. (*Id.* ¶ 40.) RAFO received a settlement offer from Roosevelt in the amount of $9,410 and a neutral letter of reference. (*Id.* ¶ 40.)[4] Silver avers in his Declaration that this amount represented "Engler's full salary for the Fall 2010-2011 and Spring 2011 semesters: (1) had he not been terminated and (2) had RAFO been successful in reinstating Engler's 2010-2011 class assignment which Roosevelt canceled." (*Id.* ¶ 40, Ex. A, Silver Decl. ¶ 16.)[5] RAFO viewed this settlement offer as reasonable. (*Id.* ¶ 42.) Engler rejected Roosevelt's settlement offer and insisted that RAFO take his grievance to arbitration. (*Id.* ¶ 43.)

On January 29, 2011, Silver wrote to Fedorko and RAFO President, LuAnn Swartzlander-Kraus, "I talked with Engler's attorneys last week, Doug Ibendahl. He says Engler has little desire to return to the job, and is mostly looking for money in the six figure amount." (Pl.'s 56.1(b)(3)(C) ¶ 15.)

In a February 10, 2011 email, Swartzlander-Kraus wrote to Fedorko, among others: "If the U makes [Engler] a puny offer, say $10,000, which [Engler] would scoff at, I would too, and would urge that we just file for the arbitration, get a date, pick an

---

[4] Engler does not object to RAFO's reference to a settlement offer. Federal Rule of Evidence 408 is not implicated as the settlement offer is not being relied upon by RAFO to "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."

[5] Engler objects that Silver's statement is a "legal argument and conclusion." Engler's objection is not persuasive.

arbitration/veto the problem ones, and write our briefs." (*Id.* ¶ 7.) She further wrote, "And victory in arbitration is still a big IF. Most everything that [Engler] is so upset about is NOT arbitratrable[sic] (not in our contract)."

By letter dated March 23, 2011, RAFO informed Engler that it would not pursue his grievance to arbitration. (Def.'s 56.1(a)(3) ¶ 44.) Silver and RAFO concluded that Engler had failed to follow the principle of "Obey and Grieve" in refusing to cooperate in Roosevelt's investigation. (*Id.* ¶ 45.) RAFO recommended that Engler accept Roosevelt's settlement offer and explained that it was unlikely for his termination grievance to prevail in arbitration, considering that he was terminated for insubordination. (*Id.* ¶ 46.)

On April 14, 2011, Engler appealed the decision not to arbitrate to RAFO's Executive Committee. (*Id.* ¶ 48.) In a letter dated April 22, 2011, RAFO informed Engler that, by a unanimous vote, the Executive Committee affirmed the earlier decision not to pursue arbitration for the same reasons given in the March 23, 2011 letter. (*Id.* ¶ 49.)

Following RAFO's final decision not to arbitrate Engler's grievance, Engler, through counsel, filed a charge with the National Labor Relations Board ("NLRB"), alleging that RAFO breached its duty of fair representation. (*Id.* ¶ 51.) The Acting Regional Director of NLRB, Region 13, dismissed the charge due to "insufficient evidence to establish that the Union's refusal to arbitrate [Engler's] grievances was based on [anything] other than a good faith evaluation of the merits of [Engler's] claim." (*Id.* ¶ 52.) Engler's attorney appealed the dismissal to the NLRB Office of the General Counsel

on July 15, 2011. (*Id.* ¶ 53.) The General Counsel denied Plaintiff's appeal, stating, "The evidence supports a finding that the Union made a rational analysis of the facts and determined that the offer of settlement was a reasonable resolution of the matter and an appropriate alternative to arbitration." (*Id.* ¶ 54.)

*RAFO's Decision Not to Arbitrate*

On December 16, 2010, RAFO representative, Barry Tusin, notified Roosevelt by email of RAFO's written demand for arbitration. (Pl.'s 56.1(b)(3)(C) ¶ 22.) On December 17, 2010, Roosevelt's counsel sent an email to RAFO, indicating that RAFO had failed to timely advance Engler's termination grievance. (*Id.* ¶ 23.) In the email, Roosevelt's counsel states:

> It is unclear to me which grievance RAFO is attempting to advance to arbitration, although I assume it is the grievance related to Professor's course assignment and not the termination given that, as I understand it, the Union did not timely advance the termination grievance. Please clarify when you can.

(*Id.*) To its Reply brief, RAFO attached the Declaration of Anne Wermuth, Roosevelt's counsel, in which she avers that her email reflects her belief that RAFO may not have timely advanced the termination grievance and she sought to preserve that argument in an arbitration hearing. She further avers, "Although my December 17, 2010 email preserved the timeliness issue, the existence of that issue would not have prevented RAFO from proceeding to an arbitration hearing on the termination grievance." (Dkt. No. 28, Wermuth Decl. ¶¶ 4, 6.)

On February 10, 2011, RAFO internally discussed whether or not to proceed to arbitration. (Pl.'s 56.1(b)(3)(C) ¶ 24.) In an email exchange on February 10, 2011,

Swartzlander-Kraus stated that no arbitration had been set "since we never officially filed for it with the AAA [American Arbitration Association] itself." (*Id.* ¶ 25.) In the same email exchange, Fedorko asked, "[I]f we file for arbitration, negotiations between Engler and Roosevelt go nowhere, and it's the eve of the grievance, would we then tell Engler that we will not carry through on the grievance?" (*Id.* ¶ 26.) Silver replied, "If the local initially decides/votes to take it to arbitration, and then wants to change its mind, the decision only needs to be based on a non-arbitrary, non-biased reason – i.e. a settlement offer as the best we believed we could get, new facts came to light, the local has no money to arbitrate, etc." (*Id.* ¶ 27.)

*RAFO's Alleged Discriminatory Treatment of Engler*

RAFO obtained the results of an investigation against a math instructor, Pierre Pouladegge. (Pl.'s 56.1(b)(3)(C) ¶¶ 29-31.) Engler requested a copy of an investigative report relating to him on May 5, 2011, but did not receive a copy of any report. (*Id.* ¶ 32.) RAFO responds that Roosevelt did not prepare an investigative report because Engler refused to attend an investigatory meeting. (Def.'s Resp. to Pl.'s 56.1(b)(3)(C) ¶ 32.)

In an internal RAFO email exchange on February 11, 2011, Fedorko stated, "I absolutely will not advocate sticking RAFO's neck out on this case. (If it were Filstead, in comparison, I would - but not Engler. And it's because of the facts of this case, not

because of the personalities involved or the sideshow that's currently taking place.)"[6] Pl.'s 56.1(b)(3)(C) ¶ 34.)

In the same email exchange, Fedorko stated, "I think [Engler] WANTS to be a martyr for his own ego, and he seems willing to go a pretty good distance in order to do it. . . . At this point the only publicity being generated is by Engler – in some sense, he is defaming himself with his martyrdom (martyr-dumb?)." (*Id.* ¶ 35.) Fedorko also stated, "I also note that all the PR Engler is generating for himself is on right-wing outlets . . . ." (*Id.* ¶ 36.)

In an internal email on January 30, 2011, Fedorko stated,

> I wouldn't specifically know if [Engler] subscribes to these groups or not. Beverly Stewart has said for a long time that she always 'thought' he was a right-winger, so there's that. I also happen to know from a non-Roosevelt colleague that [Doug] Ibendahl has worked as general counsel to the Illinois Republican Party, which says nothing specifically . . . although it IS interesting that Engler hasn't shown up on any left-wing blogs or news sites like Daily Kos, Democratic Underground or Firedolake (all of which I visit regularly), because it's obvious he's going to keep telling ME about these mentions when they come up.

(*Id.* ¶ 38.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the

---

[6] Fedorko explains in his Supplemental Declaration that the "sideshow" referred to in Fedorko's email refers to the news articles and internet media reports generated at the direction of Engler and/or his attorney. (Fedorko Supp. Decl. ¶ 10.)

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal citation omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ANALYSIS

In Count III – the only count Engler filed against RAFO – Engler alleges that although "[a]t the beginning[,] RAFO appeared to be working in good faith on behalf of Engler" (Am. Compl. ¶ 109), RAFO breached its duty of fair representation because it refused to take Engler's discharge grievance to arbitration after Engler rejected a settlement offer. (*Id.* ¶¶ 112, 123, 126.) Engler further alleges that RAFO's conduct towards him was "arbitrary, discriminatory, and in bad faith." (*Id.* ¶ 113.)

Under § 301 of the LMRA, a union member may "seek relief in federal court when his union breaches its duty to represent him fairly." *Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 891 (7th Cir. 2010) (*Truhlar*). To succeed on a claim against a union for breach of its duty of fair representation, a plaintiff must show that the union's conduct

was "arbitrary, discriminatory, or in bad faith." *Nemsky v. ConocoPhillips Co.*, 574 F.3d 859, 865 (7th Cir. 2009) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967) (*Vaca*)). "Each of these possibilities must be considered separately in determining whether or not a breach has been established." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (*Neal*).

In his Amended Complaint, Engler makes the conclusory allegation that RAFO is liable under all three aspects of the duty of fair representation. Engler fails to clearly set out which facts are evidence of bad faith and which are evidence of discrimination or arbitrariness. Moreover, in their briefs, both parties have failed to separately address each prong of the breach of the duty of fair representation.

### Arbitrariness

A union acts arbitrarily when, "'in light of the factual and legal landscape' at the time the union acted, its decision . . . was 'so far outside a wide range of reasonableness, as to be irrational.'" *Truhlar*, 600 F.3d at 892 (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). According to the Seventh Circuit, "[t]his is an 'extremely deferential standard' that precludes the courts from 'substituting their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.'" *Neal*, 349 F.3d at 369 (quoting *Ooley v. Schwitzer Div.*, 961 F.2d 1293, 1302 (7th Cir. 1992)) (*Ooley*).

Engler's allegations rest predominately, if not entirely, on the "bad-faith" prong of the duty of fair representation. (*See* Resp. at 6-10 (addressing "good faith" and "animus").) In any event, RAFO has demonstrated that there is no genuine issue of

material fact that RAFO's decision to not take Engler's grievance to arbitration was not arbitrary.

Engler's employment with Roosevelt was terminated based on "his refusal to cooperate with a formal University investigation." (Pl.'s 56.1(b)(3) ¶ 16.) The different policies relied upon by RAFO and Engler both provide that "refusing to cooperate in a formal University investigation" is grounds for immediate termination.

From May 20, 2010, to August 5, 2010, Engler did not meet with Roosevelt, despite Roosevelt's attempts to schedule an in-person meeting. On July 23, 2010, Engler learned that a previous meeting, which he refused to attend, was re-scheduled for August 6, 2010.[7] But the evening before, Engler sent Ford an email, stating, "It is impossible for me to come to Chicago at this time." Engler has set forth no evidence that he explained the reason for his absence or that he offered to work with Roosevelt to schedule another meeting to move the investigation forward.

Even more, Engler was warned by Roosevelt, on two separate occasions, that his failure to attend a meeting with Roosevelt would result in his employment with the University being terminated as of that date for refusal to cooperate with a formal University investigation. Engler was also warned by RAFO that if he did not attend the

---

[7] Engler refused to attend a July 23, 2011 meeting unless Roosevelt provided him advance notice of the charges filed against him and the identity of the student involved. However, Engler has not presented any rule or policy that would require Roosevelt to provide such information prior to a meeting. Article 4, Section K of the RAFO CBA provides, "The faculty member shall be given an opportunity to respond to [a] complaint *prior to any disciplinary action being imposed*." (*See* Dkt. No. 27, Ex. L (emphasis added).)

meeting with Roosevelt, RAFO would not be able to defend Engler from Roosevelt's harassment allegations.

In the aftermath of Engler's refusal to cooperate and Engler's termination, RAFO made a rational decision to not bring Engler's grievance to arbitration because it thought Engler's grievance lacked merit. "[A] union is not obliged to take all member grievances to arbitration." *Neal*, 349 F.3d at 369 (citing *Vaca*, 386 U.S. at 191). "Rather, it has discretion to act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer." *Id.*

Fedorko detailed in a letter he wrote to Engler on March 23, 2011:

> The fact that the Union filed for arbitration in this case or described specific contract violations in its grievances does not guarantee that the case will proceed to arbitration. The right to arbitrate, and to make the final determination on whether to arbitrate, is the solve province of the Union. Unions often file for arbitration in order to preserve time lines, and also file for arbitration to leave the door open for future attempts to negotiate a settlement. The actual decision whether or not we will go ahead with the arbitration is made after all facts have been reviewed, and strictly based on the merits of the case.

> Given the University's settlement offer would make you whole for two semesters in which were not assigned classes, the RAFO Executive Board believes your termination case lacks sufficient merit to prevail in arbitration, and for that reason we cannot take your case to arbitration.

(Dkt. No. 27, Ex. L.)

Here, the undisputed evidence shows that RAFO, in light of the factual landscape, made a rational decision that was within a "wide range of reasonableness." As the non-

moving party, Engler has presented no evidence from which a reasonable juror could find that RAFO's decision to not take Engler's grievance to arbitration was arbitrary.

*Discrimination and Bad-Faith*

RAFO has unequivocally shown that there was no discriminatory conduct in this case. Engler's response brief devotes one paragraph to arguing that RAFO engaged in discriminatory treatment. The analyses of whether a union's conduct is discriminatory or in bad faith are separate, but related; they turn on the "subjective motivation of the Union officials." *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (7th Cir. 1997), 130 F.3d at 1243 (citing *Trnka v. Local Union No. 688, UAW*, 30 F.3d 60, 63 (7th Cir. 1994) (*Trnka*)).

To succeed on the discrimination prong of the duty of fair representation, a plaintiff must present evidence of "invidious" discrimination. *See Ooley*, 961 F.2d at 1304. This means that RAFO's actions must be based on impermissible distinctions, such as race, sex, or political belief. *See, e.g., Dole v. Commonwealth Edison*, No. 91 C 5913, 1992 WL 332300, at *6 (N.D. Ill. Nov. 6, 1992) (collecting cases). Engler has presented no evidence upon which a reasonable jury could conclude that RAFO discriminated against Engler on the basis of race, sex, or political belief.

In his sole reference to discriminatory conduct, Engler argues:

> The record also contains clear evidence of discriminatory treatment by RAFO and Roosevelt with respect to Plaintiff. By email dated May 4, 2011, under the subject line "Internal Investigation," Roosevelt's counsel stated to Fedorko, "The University understands that you have requested a copy of the Investigative Report regarding the student complaint against Mr. Pouladegge. Where can I send you a copy?"

18

(Resp. at 9.) It is unclear what the basis of Engler's argument is, but he clearly does not argue that RAFO's alleged discrimination was invidious.[8]

Engler also appears to argue that RAFO had "animus and "hostility" towards him. Although Engler's arguments are not clear, rather than deem these arguments waived, they will be considered as directed to the discriminatory prong issues. *See United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998) ("We have held time and again that perfunctory and undeveloped arguments (even constitutional ones) are waived.") (citation omitted).

In support, Engler points to emails written by Fedorko. These emails contain comments such as "the only publicity being generated is by Engler" and "I wouldn't specifically know if [Engler] subscribes to these groups or not. Beverly Stewart has said for a long time that she always 'thought' he was a right-winger, so there's that." (Resp. at 11-12.) RAFO concedes that Fedorko's emails "did not portray Plaintiff or his counsel in a favorable light." (Reply at 12.) To the extent Engler is arguing that RAFO discriminated against him based on his political beliefs, his argument is not persuasive. Engler has pointed to no evidence that could remotely show a link between Fedorko's comments and RAFO's decision to not take his grievance to arbitration.

---

[8] At most, Engler appears to argue that RAFO discriminated against him because while Engler and his counsel were never provided a copy of an investigative report relating to Engler, RAFO was able to obtain a copy of the Pouladegge investigative report. (*See* Pl.'s Local Rule 56.1(b)(3)(C) ¶ 29-32.) This is not a proper basis to satisfy the discriminatory prong of the duty of fair representation. Even if it were, Pouladegge's case is distinguishable because Pouladegge cooperated with Roosevelt and attended the required meetings and, as a result, Roosevelt was able to create an investigatory report. (Fedorko Supp. Decl. ¶¶ 8, 9.)

Engler's bad-faith claim also fails. A bad-faith claim requires "substantial evidence of fraud, deceitful action or dishonest conduct." *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 299 (1971) (quotation omitted). Whether a union's actions were made "in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369. At the summary judgment stage, this means that the plaintiff "must identify conduct by Union officials that would support a reasonable inference of bad faith." *Konen v. Int'l Bhd. of Teamsters, Local 200*, 255 F.3d 402, 408 (7th Cir. 2001).

Engler's claim of bad-faith conduct against RAFO is based on the following: RAFO did not pursue arbitration because it failed to file the appropriate forms and that Roosevelt never actually conducted an investigation against Engler." (Resp. at 6-9.)

As to his first theory, Engler argues that RAFO did not take Engler's grievance to arbitration because RAFO failed to properly file the request for arbitration. In support, however, Engler offers, in support, only snippets of email correspondence between RAFO and Roosevelt that do not show that RAFO had a subjectively wrongful motivation in declining to take Engler's grievance to arbitration. Engler states that on December 17, 2010, Roosevelt's counsel sent an email to RAFO, indicating that RAFO had failed to timely file Engler's termination grievance. As set out above, in the email, Roosevelt's counsel states:

> It is unclear to me which grievance RAFO is attempting to advance to arbitration, although I assume it is the grievance related to Professor's course assignment and not the termination given that, as I understand it, the Union did not

20

> timely advance the termination grievance. Please clarify
> when you can.

But this email, however, does not show that RAFO failed to file the termination

grievance in a timely manner or that RAFO could not proceed to arbitration. Even if it

did, Engler has failed to set forth any evidence that RAFO's decision to not pursue the

arbitration was motivated by a failure to file the appropriate forms.

As discussed above with respect to the arbitrariness prong, RAFO has presented

undisputed evidence that it did not take Engler's grievance to arbitration because it

lacked merit. Engler has failed to show that there is evidence in the record from which a

reasonable juror could infer that RAFO did not take his claim to arbitration because

RAFO failed to file the appropriate papers. *See, e.g., Trnka*, 30 F.3d at 63 ("where

innocent or multiple explanations for a defendant's actions abound a plaintiff must rely

on more than *post hoc, propter hoc* reasoning" to show bad faith).

As to Engler's next bad-faith theory, Engler argues that RAFO lacks good faith

because "there was no harassment in this case [and] an investigation was never conducted

by Roosevelt." (Resp. at 8.) However, there is ample undisputed record in the evidence

to indicate that a harassment complaint was filed against Engler and that Roosevelt

initiated an inquiry into the complaint. Furthermore, Engler's argument misconstrues the

basis of his employment termination. As set out above, Engler's employment was

terminated because he *failed to cooperate* with Roosevelt's investigation. In light of the

factual circumstances surrounding Engler's discharge, RAFO made the decision not to

take Engler's grievance to arbitration in good-faith.

**CONCLUSION**

RAFO's Motions to Strike Portions of Plaintiff's Rule 56.1(b)(3)(A) Response [41] is granted in part. RAFO's Motion to Strike Portions of Plaintiff's Local Rule 56.1(b)(3)(C) Statement [42] is denied.

For the reasons set forth above, RAFO's Motion for Summary Judgment [25] is granted. Count IV is dismissed. As this is the only count against RAFO, RAFO is dismissed from this litigation.

Date: _June 15, 2018_

JOHN W. DARRAH
United States District Court Judge